

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

WK:BLW
F. #2021V00548

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 6, 2021

By ECF

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. German Dario Polanco
                Criminal Docket No. 07-780 (FB)

Dear Judge Block:

      The government respectfully submits this letter in response to defendant German Dario Polanco's pro se motion for a reduced sentence under Title 18, United States Code, Section 3582(c)(1)(A)(i), as modified by the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239. (See Mot. to Reduce or Modify Term of Imprisonment ("Def. Mot."), United States v. Polanco, No. 07-CR-780 (FB) (E.D.N.Y. Apr. 19, 2021), ECF No. 180.) For the reasons stated below, this Court should deny the motion.

I.    Background

    A.    The Defendant's Offense Conduct

      Between August and September 2000, Polanco orchestrated the murder of two people whom he believed had stolen approximately $316,000 in drug money from a stash house of his in 1998. (See November 23, 2011, Revised Presentence Investigation Report ("PSR") ¶¶ 2-3.) In fact, Polanco's victims—one of whom was only 14 years old at the time of his death—were not responsible for the theft of Polanco's drug money and were innocent victims. (See id. ¶ 10.) Polanco was arrested for these murders in May 2007, while already in federal custody for a separate narcotics conviction, and in March 2010 was convicted of two counts of murder in furtherance of a continuing criminal enterprise and two counts of murder through the use of a firearm. (See id. ¶ 1; see also Indictment ¶¶ 1-4, United States v. Polanco, No. 07-CR-780 (FB) (E.D.N.Y. Oct. 22, 2007), ECF No. 7.)

At the time of the murders and continuing thereafter, Polanco was involved in drug trafficking. In the late summer or early fall of 2000, Polanco was responsible for transporting 80 kilograms of cocaine from Chicago to New York. (See PSR ¶ 15.) In February 2001, Polanco was arrested in Miami after purchasing 16 kilograms of cocaine from an undercover agent from the United States Drug Enforcement Administration. (See Compl. at 4-5, United States v. Polanco, No. 01-CR-178 (ASG) (S.D. Fla. Feb. 23, 2001), ECF No. 2.) In May 2002, Polanco pleaded guilty to two violations of 21 U.S.C. § 846 for conspiring to possess with intent to distribute five kilograms or more of cocaine and for attempting to possess with intent to distribute five kilograms or more of cocaine. (See J., United States v. Polanco, No. 01-CR-178 (ASG) (S.D. Fla. June 3, 2002), ECF No. 101.) He was sentenced to 87 months in prison for these crimes. (See PSR ¶ 47.)

In August 2000, Polanco approached an "enforcer" within his drug organization and asked him to recruit hitmen from outside the organization to murder two former associates whom Polanco believed had betrayed him and stolen $316,000 of his drug proceeds. (See id. ¶¶ 3-4; Sentencing Mem. ("Gov't Sent. Mem.") at 2, United States v. Polanco, No. 07-CR-780 (FB) (E.D.N.Y. Aug. 11, 2011), ECF No. 133.) Another associate of Polanco's from within the drug organization agreed to supervise the planning and commission of the murders. (See Gov't Sent. Mem. at 1-2.) Polanco met with these two individuals to discuss the murders and advised that he wanted to either be out of the state or country when the murders were committed and stressed that any other individuals hired to commit the murders be from outside his drug organization and unconnected to him. (See PSR ¶ 4.) In turn, Polanco's enforcer recruited another individual to commit the murders for a fee of $7,500 per murder. (See id. ¶ 7.) On the day of the murders, that individual brought a friend with him to assist in the murders. (See id. ¶ 8.)

On the day of the murders, Polanco's enforcer and the two individuals who agreed to commit the murders drove to a home where they believed their intended targets were and conducted hours of surveillance. (See id. ¶ 9.) When the victims left the house, Polanco's enforcer and the two shooters blocked the victims' car with their own and the shooters exited the car, approached the victims' car and fired multiple, fatal gunshots into the victims' faces and chests. (See id. ¶ 10.) After fleeing the scene, Polanco's enforcer paged Polanco and advised him that the murders had been completed. (See id. ¶ 11.) Later that evening, Polanco instructed the enforcer to go to a specific telephone shop and, once the enforcer was there, Polanco called the clerk at the front desk of the store and instructed her to give the enforcer $13,000. (See id.)

Polanco was the mastermind behind the murders of two innocent victims, including a 14-year-old boy. (See id. ¶ 16.) He approached the enforcer in the first instance and he ultimately gave the order that led to the victims' deaths. (See id.) And even after learning that the enforcer and the shooters had killed the wrong people, Polanco directed the enforcer to keep looking for and "hunt down" the intended targets. (See id.)

B.   The Defendant's Guilty Plea and Sentencing

On March 22, 2010, after a nine-day trial before Judge David G. Trager, a jury convicted Polanco of all four counts of the indictment—two counts of violating 21 U.S.C. § 848(e)(1)(A) and two counts of violating 18 U.S.C. § 924(j)(1). (See Indictment ¶¶ 1-4, United States v. Polanco, No. 07-CR-780 (FB) (E.D.N.Y. Oct. 22, 2007), ECF No. 7; Jury Verdict at 1-2, United States v. Polanco, No. 07-CR-780 (FB) (E.D.N.Y. Mar. 26, 2010), ECF No. 75.) On

February 4, 2011, Judge Dearie was assigned the case after Judge Trager's death. On July 5, 2011, your honor took over the case from Judge Dearie. On September 21, 2011, this Court sentenced Polanco to a term of life on each of the four counts, with each term to run concurrently. (See J. at 2, United States v. Polanco, No. 07-CR-780 (FB) (E.D.N.Y. Sept. 26, 2011), ECF No. 135.)

      C.      The Defendant's Motion and Recent Information on the Defendant's Status

In the instant motion, filed on April 19, 2021, Polanco asks the Court to reduce his sentence and permit him "to serve the rem[a]inder of his sentence on probation or supervised release." Def. Mot. at 3. Polanco contends that conditions at Federal Correctional Institution ("FCI") Coleman, coupled with a host of relatively minor medical conditions, such as headache hypertension, hyperlipidemia (high cholesterol), erythematosquamous dermatosis (a skin condition producing dry, scaly skin), psoriasis, chronic rhinitis (stuffy nose), gastroesophageal reflux disease (GERD), dyspepsia (stomach pain) and cervicalgia (neck pain), make him particularly vulnerable to contracting COVID-19 and its most severe complications, thereby warranting a reduced sentence. Id. at 2.

Polanco submitted an application for a reduced sentence to the warden at FCI Coleman on July 16, 2020. Id. at 13. On August 26, 2020, the FCI Coleman warden denied Polanco's application, noting:

> Your condition is stable, you are not terminally ill, your life expectancy is normal for your age. You are not completely disabled and totally confined to a bed or chair. You are able to independently attend to your activities of daily living and your medical condition does not affect your ability to function in a correctional setting.

Id. at 11. Polanco appealed the warden's denial on September 8, 2020. Id. at 17. It is unclear if the warden issued a decision on Polanco's appeal but, in any event, over 30 days lapsed between Polanco's appeal and his submission of the instant motion to the Court.[1]

---

[1] Under the First Step Act, the Court may order a sentence reduction only when "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons ("BOP") to bring a motion [for a reduced sentence] on the defendant's behalf" or thirty days have "lapse[d] . . . from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The government does not argue that Polanco has failed to exhaust his administrative rights to appeal.

3

D.  The BOP's Response to the COVID-19 Pandemic

From the moment the pandemic began, the BOP made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and Prevention ("CDC") and the World Health Organization. Those efforts continue.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry. When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.

BOP's efforts extend to the medium security facility at FCI Coleman, where Polanco resides. As of the date of this response, FCI Coleman Medium houses 1,367 inmates. See FCI Coleman Medium, https://www.bop.gov/locations/institutions/com/ (last visited May 6, 2021). As of the date of this response, FCI Coleman Medium has 0 active inmate cases of COVID-19 and 1 active staff case. See COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited May 6, 2021). To date, 329 inmates and 54 staff have tested positive for and recovered from COVID-19 at FCI Coleman and 3 inmates and 0 staff have died from COVID-19. See id.

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19 vaccine as it becomes available. As of the week of February 8, 2021, doses of the vaccine had been delivered to every BOP institution. As of this time, vaccines have been administered to all willing staff members. BOP is now in the process of offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines. In general, the vaccine is offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. As of the date of this response, BOP has administered a total of 161,749 doses to staff and inmates nationwide. See COVID-19 Vaccine

Implementation, https://www.bop.gov/coronavirus/ (last visited May 6, 2021). Across the medium and low security facilities at FCC Coleman, 2,446 out of 3,188 inmates have been fully vaccinated. See id.; FCI Coleman Medium, https://www.bop.gov/locations/institutions/com/ (last visited May 6, 2021); FCI Coleman Low, https://www.bop.gov/locations/institutions/col/ (last visited May 6, 2021).

II.     Argument

This Court should deny Polanco's motion for a reduced sentence. District courts may reduce a sentence under 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of showing that a reduced sentence is justified. See United States v. Pellegrino, 492 F. Supp. 3d 65, 68 (E.D.N.Y. 2020). In assessing whether a reduced sentence is justified, courts must consider both whether the defendant has presented an "extraordinary and compelling" reason for a reduced sentence and the 18 U.S.C. § 3553(a) sentencing factors. See United States v. Rosario, 834 F. App'x 661, 664 (2d Cir. 2021). A court should deny a defendant's motion if it concludes that either: (1) the defendant has not presented an extraordinary and compelling reason for a reduced sentence or (2) the section 3553(a) factors weigh against release. See United States v. Roney, 833 F. App'x 850, 853 (2d Cir. 2020) (explaining that, even if the defendant presented extraordinary and compelling reasons for release, his motion could be denied based solely on a consideration of the section 3553(a) factors). Both the lack of an extraordinary and compelling reason for a reduced sentence and the section 3553(a) factors weigh against releasing Polanco in this case.

    A.     Polanco Fails to Demonstrate an Extraordinary and Compelling Reason for a Reduced Sentence

Polanco's motion should be denied because he has not demonstrated an extraordinary and compelling reason for a reduced sentence. The United States Sentencing Guidelines (the "Sentencing Guidelines" or "U.S.S.G.") and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also U.S. Dep't of Justice, Fed. Bureau of Prisons, OGC/LCI 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last visited May 6, 2021). Although the Court is not bound by the Sentencing Guidelines in making this determination, section 1B1.13 "provides some useful guidance" on what constitutes an extraordinary and compelling reason for a reduced sentence. United States v. Markou, No. 08-CR-399 (RJD), 2020 WL 6945923, at *2 (E.D.N.Y. Nov. 25, 2020). Further, adopting section 1B1.13 as the definition for "extraordinary and compelling reasons" would give due respect to Congress' express delegation of definitional power to the Commission. See 28 U.S.C. § 994(t).

Polanco cannot establish that any of the extraordinary and compelling reasons articulated in section 1B1.13 apply here. Application note 1(A) to section 1B1.13 states that extraordinary and compelling reasons exist if "[t]he defendant is suffering from a terminal illness" or is suffering from an impairment "that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he is not expected to recover." U.S.S.G. § 1B1.13 application note 1(A). Though Polanco does have

several medical conditions, they are all either stable or relatively minor and there is no indication that any of his illnesses are terminal or render him unable to provide self-care in the correctional facility setting. Under similar circumstances, this Court has previously held that extraordinary and compelling reasons justifying a reduced sentence do not exist. See United States v. Rivers, No. 03-CR-01120 (FB), 2020 WL 5043931, at *1 (E.D.N.Y. Aug. 26, 2020) ("That Defendant is 72 and suffers from stable, albeit chronic, medical issues is insufficient to constitute 'extraordinary and compelling circumstances' for his release.").

Application note 1(B) to section 1B1.13 states that extraordinary and compelling reasons exist if the defendant is: (i) at least 65, (ii) "experiencing a serious deterioration in physical or mental health because of his aging process," and (iii) has served either 10 years or 75 percent of his sentence, whichever is less. U.S.S.G. § 1B1.13 application note 1(B). Besides the fact that Polanco is not experiencing "a serious deterioration in physical or mental health" and has not served 10 years on his life sentences, he is only 59 years old. See Def. Mot. at 9. For these reasons, the scenario contemplated by application note 1(B) is inapplicable here.

Application note 1(C) to section 1B1.13 provides two extraordinary and compelling reasons based on family circumstances: (i) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" and (ii) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 application note 1(C). Polanco does not assert that either of these circumstances exists.

Application note 1(D) to section 1B1.13 provides that extraordinary and compelling reasons may exist even if the conditions of application notes 1(A) – 1(C) are not present, but cabins the applicability of this subdivision to situations in which the Director of the BOP has found these extraordinary and compelling reasons to exist in the specific case of the petitioning defendant. See U.S.S.G. § 1B1.13 application note 1(D). Here, the BOP Director has made no such determination.

Polanco asserts that extraordinary and compelling reasons justifying a reduced sentence exist here due to a combination of the risk posed by COVID-19 and his rehabilitation to date (in his words, "an exceptional body [of] work done in remarkable short time"). Def. Mot. at 2. With respect to COVID-19, Polanco does not suffer from any condition that, per the CDC, makes individuals more likely to become severely ill from COVID-19. See Ctrs. for Disease Control and Prevention, People with Certain Medical Conditions, (Apr. 29, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited May 6, 2021). Further, numerous courts in the Second Circuit have stated that the risk posed by COVID-19 does not constitute an extraordinary and compelling reason in situations where the movant has received the COVID-19 vaccine, ▮▮▮▮▮▮▮▮ See United States v. Reiter, No. 87-CR-132 (VSB), 2021 WL 1424332, at *8 (S.D.N.Y. Apr. 15, 2021) ("Because [the defendant] has been vaccinated, [his] health conditions and the spread of COVID-19 [in prison] no longer present an 'extraordinary and compelling reason' for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i)."); United States v. Kosic, No. 18-CR-30 (PAC), 2021 WL 1026498, at *2 (S.D.N.Y. Mar. 17, 2021) ("[C]ourts in this circuit have found that vaccination mitigates the risk

an inmate faces from COVID-19 to the point that his health conditions weighing in favor of release are no longer extraordinary and compelling."); United States v. Johnson, No. 94-CR-631 (PGG), 2021 WL 640054, at *5 (S.D.N.Y. Feb. 18, 2021) (finding no extraordinary and compelling reasons despite the defendant's obesity—a conceded risk factor for becoming severely ill from COVID-19—in light of the fact that the defendant had received one vaccination dose, which "mitigates the risks that he would otherwise face from the COVID-19 virus."). This risk is only further mitigated by the steps the BOP has taken to prevent the spread of COVID-19 and the fact that zero FCI Coleman – Medium inmates currently have the virus. See, e.g., United States v. Harris, No. 18-CR-628 (JMA), 2021 WL 848865, at *1 (E.D.N.Y. Mar. 5, 2021) (denying motion for reduced sentence and stating that "[t]hough the Court is sympathetic to Defendant's medical conditions, it is by no means certain Defendant will contract COVID-19, particularly in light of: (1) his vaccination; (2) the protective measures the BOP has taken to curb spread of the disease; and (3) the fact that only one inmate is currently testing positive for COVID-19 at his facility.").

Particularly in light of the fact that Polanco's medical conditions and the risk posed by COVID-19 do not constitute extraordinary and compelling reasons for a reduced sentence, his passing reference to his rehabilitation similarly does not warrant a reduced sentence. As application note 3 to section 1B1.13 states "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason." U.S.S.G. § 1B1.13 application note 3. Polanco does not provide any detail regarding his rehabilitation or any evidence supporting his claims regarding his rehabilitation.

Thus, even considered in their totality, Polanco's reasons are neither extraordinary nor compelling enough to warrant a reduced sentence.

    A.    Polanco Fails to Show That the Section 3553(a) Factors Warrant a Reduced Sentence

Even if extraordinary and compelling reasons were to exist here (which they do not), the Court should deny the motion in light of the relevant section 3553(a) factors. Irrespective of the Court's analysis respecting the existence or lack thereof of extraordinary and compelling reasons, "a court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." United States v. O'Neil, No. 17-CR-444 (JMA), 2021 WL 1616915, at *1 (E.D.N.Y. Apr. 26, 2021). Review of the factors in the instant case "presents an insurmountable barrier to relief." Markou, 2020 WL 6945923, at *2.

At the outset, the government notes that Polanco fails entirely to argue that the applicable section 3553(a) factors warrant a reduced sentence. Because he bears the burden of proof, see Pellegrino, 492 F. Supp. 3d at 68, the Court should summarily deny the motion.

Moreover, the applicable sentencing factors counsel against a reduction. The first, second and fourth factors are most applicable here. Respectively, those are: (i) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (ii) "the

7

need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and (iii) "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(1), (2) and (4).  At the time of his sentencing, Polanco was a seasoned member of a drug organization in a leadership position.  His total offense level was above the highest level on the sentencing table, thereby resulting in a Guidelines range of life imprisonment.  (See Gov't Sent. Mem. at 4.)  Under these circumstances, "[i]n the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed." U.S.S.G. § 2A1.1 application note 2.

Even setting aside the presumptive appropriateness of a life sentence for a premeditated killing, the Court should not lose sight of the egregiousness of Polanco's crimes.  Not only did Polanco order, pay for and intentionally cause the murder of two people, he did it to retaliate against former associates in his drug organization and to maintain order within the organization.  Worse yet, Polanco's orders resulted in the murders of the wrong people—two victims who were innocent of the theft that Polanco was seeking to avenge.  One of the victims was a 14-year-old boy.  Undeterred by the heinous mistake that his actions resulted in, Polanco continued to direct his subordinates to "hunt down" the intended targets.

To date, Polanco has served less than 10 years in prison.  In light of the seriousness of his offense, the severe harm caused to Polanco's victims, the continued need to deter others from committing similar crimes and the continued need to protect the public from further crimes, a reduction of the Court's sentence would "fail to achieve the importance policies of the § 3553(a) factors—namely, providing just punishment, affording adequate deterrence, and promoting respect for the law." United States v. Tranese, No. 17-CR-559 (CBA), 2021 WL 25371, at *2 (E.D.N.Y. Jan. 4, 2021).

III.    Conclusion

For the foregoing reasons, the government respectfully submits that this Court should deny Polanco's motion for a reduced sentence.

                Respectfully submitted,

                MARK J. LESKO
                Acting United States Attorney

By:    /s/ Benjamin Weintraub
        Benjamin Weintraub
        Assistant U.S. Attorney
        (718) 254-6519

cc:    Clerk of the Court (FB) (via ECF)
        German Dario Polanco, pro se (via certified mail)